1  BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
2  PATRICIA N. SYVERSON (CA SBN 203111)
   MANFRED P. MUECKE (CA SBN 222893)
3  600 W. Broadway, Suite 900
   San Diego, California 92101
4  psyverson@bffb.com
   mmuecke@bffb.com
5  Telephone: (619) 798-4593

6  BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
7  ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
   CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
8  2325 E. Camelback Rd. Suite 300
   Phoenix, AZ 85016
9  eryan@bffb.com
   claliberte@bffb.com
10 Telephone: (602) 274-1100

11 *Attorneys for Plaintiffs*
   *Additional Attorneys on Signature Page*

12

13 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15 TARA DUGGAN, LORI MYERS, ANGELA COSGROVE, ROBERT | Case No.: |
| 16 MCQUADE, COLLEEN MCQUADE, JAMES BORRUSO, | **CLASS ACTION COMPLAINT FOR:** |
| 17 ROBERT NUGENT, ANTHONY LUCIANO, LORI LUCIANO, FIDEL | 1. VIOLATION OF THE UNFAIR |
| 18 JAMELO, JOCELYN JAMELO, | COMPETITION LAW, Business and |
| 19 ROBERT LANTOS, AMAR MODY, | Professions Code §17200 *et seq.*; |
| 20 HEENA MODY, AVRAHAM ISAC | 2. VIOLATION OF THE |
| 21 ZELIG, DENESE DEPEZA, and | CONSUMERS LEGAL REMEDIES |
| KATHLEEN MILLER, On Behalf of | ACT, Civil Code §1750 *et seq.*; |
| 22 Themselves and All Others Similarly | 3. VIOLATION OF FLORIDA |
| 23 Situated, | DECEPTIVE AND UNFAIR |
| | TRADE PRACTICES ACT – Fla. |
| 24 Plaintiffs, | Stat. § 501.201, *et seq.*; |
| 25 | 4. VIOLATION OF THE NEW YORK |
| v. | GENERAL BUSINESS LAW § 349; |
| 26 | 5. VIOLATION OF THE NEW |
| 27 BUMBLE BEE FOODS LLC, a | JERSEY CONSUMER FRAUD |
| Delaware company, | ACT, § 56:8-2.10; |
| 28 | 6. VIOLATION OF THE MARYLAND |

Defendant.

CONSUMER PROTECTION ACT –
Maryland Code §§13-101, *et seq.*;
7.   VIOLATION OF THE ARIZONA
CONSUMER FRAUD ACT, A.R.S.
§§44-1521, *et seq.*; and
8.   UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

Plaintiffs Tara Duggan,  Lori Myers, Angela Cosgrove, Robert McQuade, Colleen McQuade, James Borruso, Robert Nugent, Anthony Luciano, Lori Luciano, Fidel Jamelo, Jocelyn Jamelo, Robert Lantos, Amar Mody, Heena Mody, Avraham Isac Zelig, Denese Depeza, and Kathleen Miller bring this action on behalf of themselves and all others similarly situated against Defendant Bumble Bee Foods LLC ("Defendant" or "Bumble Bee"), and state:

## FACTUAL ALLEGATIONS

1.     Bumble Bee was founded in 1899 and has been marketing, selling, and distributing tuna throughout the United States since 1920.  Today, Bumble Bee Foods LLC is North America's largest branded shelf-stable seafood company, offering a full line of canned, pouched, and tuna on-the-run kits under its flagship Bumble Bee brand as well as its premium Wild Selections and Brunswick brands.

2.     Since 1990, Bumble Bee has promised consumers that "[a]ll of our tuna products are 'Dolphin Safe'".  All of Bumble Bee's canned tuna products display a dolphin safe logo immediately to the left of the calories, saturated fat, sodium, and sugar disclosures.  The logo is featured directly underneath the nutrition facts panel on the very bottom right corner of Defendant's tuna pouches.  The logo appears below the Bumble Bee website URL and on the very bottom right corner of Defendant's tuna on-the-run kits.  Since the introduction of the dolphin safe policy in 1990, including the last 4 years (the "Class Period"), however, Bumble Bee's tuna products have not been "Dolphin Safe".

### **Origin of "Dolphin Safe" Tuna**

3.     Prior to the development of modern purse seine fishing techniques, tropical tuna were caught one at a time using traditional pole-and-line methods. NOAA, The Tuna-Dolphin Issue, NOAA Fisheries Southwest Fisheries Science Center (September 2, 2016), *available at*

Class Action Complaint

https://swfsc.noaa.gov/textblock.aspx?Division=PRD&ParentMenuId=228&id=140 8 (last visited May 3, 2019) ("NOAA 2016").

4.      But by the 1950s, the development of synthetic netting (that would not rot in tropical waters) and hydraulically driven power-blocks (needed to haul very large nets) made it possible to deploy massive purse-seines (vertical net curtains closed by pulling on a chain located along the bottom to enclose the fish, much like tightening the cords of a drawstring purse) around entire schools of tuna.

5.      Recognizing that tuna schools (swimming deeper in the water) often congregate with dolphin schools (swimming at observable depths), fishermen began routinely encircling tuna *and* dolphin schools with purse seine nets and hauling the entire catch aboard.

6.      This practice led to millions of dolphins being killed as unintended bycatch.

7.      In the late 1980s, the world learned of the large numbers of dolphins indiscriminately killed by tuna fishermen. In 1988, a worldwide telecast showed video images of dolphins being killed in tuna fishing nets.  That video was captured by an undercover environmental activist posing as a ship's cook.  Public outcry was immediate and intense.

8.      Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations around the world, including a strengthening of the Marine Mammal Protection Act ("MMPA") and the enactment of the Dolphin Protection Consumer Information Act ("DPCIA") of 1990.

9.      Recognizing these indiscriminate fishing methods were also deflating consumers' enthusiasm for tuna products, the major sellers of tuna fish – including Bumble Bee, Chicken of the Sea, and StarKist – started promising consumers that the tuna they sold would only be procured through dolphin safe fishing practices.

10.    In the ensuing 25 years, U.S. tuna sellers, including Bumble Bee, initiated and implemented a widespread and long-term marketing campaign that continues to this day – representing to consumers that no dolphins were killed or harmed in capturing their tuna, as well as expressing their commitment to sustainably sourcing tuna.

11.    For at least the last 4 years, reasonable consumers expected that all Bumble Bee canned, pouched, and on-the-go kit tuna (collectively, "tuna products") are dolphin safe because they have been indoctrinated to believe precisely that by Defendant's and the other tuna companies' highly effective dolphin safety and sustainable fishing practices marketing campaigns.  In fact, 98% of the prepacked tuna sold today in the United States is labeled with some "dolphin safe" representation.  Forbes, K. William Watson, 'Dolphin Safe' Labels on Canned Tuna Are A Fraud (April 29, 2015), *available at* https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/#51db16b8295e (last visited May 3, 2019).

12.    Bumble Bee tuna, however, is not dolphin safe.  Nor is it sustainably sourced.  Defendant's dolphin safe representations are false, misleading, and/or deceptive.

### Bumble Bee's Dolphin Safe Representations

13.    In 1990, Bumble Bee was one of the first major tuna companies to adopt a "dolphin safe" policy.

14.    On every can, pouch, and kit, Defendant states that the tuna products are "Dolphin Safe" with a prominent dolphin logo.  The tuna products also include Bumble Bee's website which sets forth Defendant's dolphin safe policy.

15.    Bumble Bee's website explains what Defendant means by "Dolphin Safe," and the meaning attributed to "Dolphin Safe" by Defendant reflects its importance to consumers.  Defendant promises in pertinent part:

- Bumble Bee remains "fully committed to" and "strictly adhere[s]" to the dolphin safe policy implemented in April 1990.
- Bumble Bee "will not purchase tuna from vessels that net fish associated with dolphins".
- All of Bumble Bee's tuna products "are Dolphin Safe meeting both the standards of United States 1990 Dolphin Protection Consumer Information Act (Dolphin Safe Labeling Law) and of the Earth Island Institute. All or our products carry a Dolphin Safe logo to indicate that."

Bumble Bee, FAQ, *available at* http://www.bumblebee.com/faqs/ (last visited May 7, 2019).

16.     As noted by the Ninth Circuit in a recent case, "[g]iven the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin-safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (rejecting Government efforts to lessen restrictions on tuna fisheries in the Eastern Tropical Pacific and upholding previous finding that best evidence available indicates that tuna fishing was having significant adverse impact on dolphin stocks).

17.     The importance to consumers of dolphin safety has not lessened in the ensuing 12 years since the Court's finding, as evidenced by Defendant's continued labeling of its tuna products with a dolphin safe logo and commitment to sustainable fishing practices.

18.     If anything, dolphin safety and the sustainable sourcing of seafood has grown in importance to consumers as evidenced by many retailers' refusal to sell

tuna that is not caught using dolphin safe pole-and-line, trolling[1], or handline catch methods.  *See, e.g.*, Whole Foods Market, Sustainable Canned Tuna, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited April 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, Canned Tuna Sourcing Policy (August 15, 2018), *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited April 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna (February 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited April 17, 2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015), at 21, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited April 29, 2019) ("Suppliers are encouraged to "Not use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-

---

[1] Method of fishing whereby one or more fishing lines with baits are drawn through the water.  Monterey Bay Aquarium Seafood Watch, Fishing & Farming Methods, *available at* https://www.seafoodwatch.org/ocean-issues/fishing-and-farming-methods (last visited May 3, 2019).

Seafood-Policy (last visited April 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited April 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling FADs"); Wegmans, Seafood Sustainability, *available        at*        https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited April 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch.").

19.    Almost all retailers have implemented sustainable seafood sourcing policies and goals in response to customer feedback.  Kroger, for example, which operates 2,782 retail supermarkets in 35 states and the District of Columbia and serves over 9 million customers a day, has adopted a comprehensive sustainable sourcing program in response to customer feedback received at "in-store service counters, online surveys, telephone surveys, focus groups, websites and social media" as well as its live call "Kroger Customer Connect" center.  The Kroger Family of Companies 2018 Sustainability Report ("Kroger Sustainability Report"), *available at* http://sustainability.kroger.com/Kroger_CSR2018.pdf (last visited May 3, 2019), at 12.

20.    The special "Dolphin Safe" logo Defendant includes on each Bumble Bee tuna product as shown below is intended by Defendant to convey the message "All of our tuna products are Dolphin Safe":



21.    However, unknown to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendant's tuna.   Thus, Defendant's dolphin safe label representations are false, misleading, and/or deceptive.

### Dolphin Safety Legislation

22.    Since the 1980s, Congress has passed a series of laws to protect dolphins and other marine life from indiscriminate fishing methods.   Beginning with the MMPA, which Congress repeatedly strengthened in 1984, 1988, and 1992, Congress "ban[ned] importation of tuna that failed to meet certain conditions regarding dolphin mortality."   *Earth Island Institute v. Evans*, No. C 03-0007-THE, ECF No. 293 at 3 (N.D. Cal.).

23.    Then, in 1990, Congress passed the DPCIA, which created the dolphin safe mark.  16 U.S.C. §1385.  The Act provided that tuna could only be labeled with the official "dolphin safe" mark codified at 50 CFR §216.95 if, *inter alia*, the tuna was not caught in the Eastern Tropical Pacific ("ETP") using nets intentionally deployed on or to encircle dolphins, was certified as dolphin safe by an independent observer on the tuna boat, and can be traced from the fishery, to the cannery, to the shelf.  *Id.*

24.    The DPCIA imposes heightened dolphin safety requirements which are not limited to ETP fisheries on manufacturers, like Defendant, who label their products with an alternative dolphin safe logo. 16 U.S.C. §1385(d)(3).

25.    The DPCIA-established official dolphin safe mark is codified at 50 CFR §216.95.  That official mark contains the words "U.S. Department of Commerce", along with the words "Dolphin Safe" in red next to a blue-colored dolphin profile facing the upper left, and a tricolor (light blue, blue, and dark blue) banner along the bottom of the mark that overlaps with the dolphin's fluke:



26.    Defendant elected not to utilize the DPCIA official dolphin safe logo. By placing an alternative "Dolphin Safe" logo on Bumble Bee tuna products, rather than the official mark, Defendant voluntarily assumed the heightened dolphin safety requirements under the DPCIA applicable to all locations where Defendant captures its tuna.  Pursuant to the regulations, Defendant must ensure that (1) "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught"; and (2) the label must be "supported by a tracking and verification program" throughout the fishing, transshipment and canning process; "periodic audits and spot checks" must be conducted, and Bumble Bee must provide "timely access to data required".  16 U.S.C. §§1385(d)(3)(C) and (f).

27.    To be clear, the Act and implementing regulations specify that "no" dolphins must be "killed or seriously injured" and if "a" dolphin "was killed or seriously injured [defined as 'any injury that will likely result in mortality' (50 CFR

- 8 -
Class Action Complaint

§216.3)]" the tuna is not dolphin safe and must be stored physically separate from tuna that is dolphin safe and must be supported by sufficient documentation to enable the National Marine Fisheries Service to trace the non-dolphin safe tuna back to the fishing trip.  50 CFR §216.91.

28.     Plaintiffs allege that Defendant falsely represents that Bumble Bee tuna products are "Dolphin Safe" – meaning "no" dolphins were killed or seriously injured – when Defendant's tuna fishing practices kill or harm substantial numbers of dolphins each year and even though there are alternative fishing practices that are dolphin safe which Bumble uses to catch the tuna in its premium Wild Selections brand and which other tuna companies use.  And because Defendant does not adequately trace or otherwise identify the tuna that is not dolphin safe and physically segregate and store it separately from any tuna that may be dolphin safe (if any), Defendant may not label any of its tuna products as dolphin safe.

**World Trade Organization Dispute Regarding "Dolphin Safe" Labels**

29.     In 2008, a trade dispute erupted between Mexico and the United States over the use of a dolphin safe representation on labels of prepacked tuna products sold in the United States pursuant to the DPCIA and the Ninth Circuit's holding in *Earth Island Institute v. Hogarth, supra*.

30.     Mexico, which fishes for tuna primarily in the ETP using purse seine nets, alleged that the DPCIA discriminated against Mexican tuna because it imposed stricter regulations and required more exacting documentary evidence of compliance with the Act for tuna caught in the ETP than in other fisheries.

31.     On September 15, 2011, the WTO Panel hearing the dispute issued its first Report.  The Panel disagreed that the DPCIA discriminates against Mexico, but also found the Act was more trade-restrictive than necessary to fulfill its legitimate objectives of ensuring (i) consumers are not deceived by dolphin safe representations, and (ii) United States markets are not used to encourage tuna fishing practices that

harm dolphins.  Both Mexico and the United States appealed.

32.     On May 16, 2012, the WTO Appellate Body issued its Report.  Among other findings, the Appellate Body found the DPCIA and the ruling in *Hogarth* together:

> set out a single and legally mandated definition of a "dolphin-safe" tuna product and disallows the use of other labels on tuna products that use the terms "dolphin-safe", dolphins, porpoises and marine mammals and do not satisfy this definition.  In doing so, the US measure prescribes in a broad and exhaustive manner the conditions that apply for making any assertion on a tuna product as to its "dolphin-safety", regardless of the manner in which that statement is made.

*See* Official Summary, WTO DS381, current through Jan. 31, 2019, *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm   (last   visited May 10, 2019).

33.     However, the Appellate Body also found the DPCIA discriminated against Mexico.  In doing so, the Appellate Body:

> examined whether the different conditions for access to a "dolphin-safe" label are "calibrated" to the risks to dolphins arising from different fishing methods in different areas of the ocean, as the United States had claimed.  The Appellate Body noted the Panel's finding that the fishing technique of setting on dolphins is particularly harmful to dolphins and that this fishing method has the capacity of resulting in observed and unobserved adverse effects on dolphins.  **At the same time, the Panel was not persuaded that the risks to dolphins from other fishing techniques are insignificant and do not under some circumstances rise to the same level as the risks from setting on dolphins.**  The Appellate Body further noted  the Panel's finding that, while the US measure fully addresses the adverse effects on dolphins resulting (including observed and unobserved effects) from setting on dolphins in the ETP, it does not address mortality arising from fishing methods other than setting on dolphins in other areas of the ocean.  In these circumstances, the Appellate Body found that the measure at issue is not even-handed in the manner in which it addresses the risks to dolphins arising from different fishing techniques in different areas of the ocean.

*Id.* (emphasis added).

34.     In other words, the WTO Appellate Body found that fishing methods

being employed in and out of the ETP were likely harming dolphin populations and the U.S. regulatory regime designed to protect dolphins was perhaps not strong enough in its regulation of fisheries outside the ETP.

35.     Following this Report, on May 31, 2012 Defendant, along with StarKist and Chicken of the Sea, issued the following press release through the National Fisheries Institute ("NFI"):

> **STATEMENT ON WTO DOLPHIN SAFE TUNA RULING**
>
> NFI is the leading seafood trade association in the United States and represents Bumble Bee, Chicken of the Sea and StarKist.
>
> Household tuna brands Bumble Bee, Chicken of the Sea and StarKist are disappointed in the World Trade Organization's (WTO) appeals court ruling because it is likely to create consumer confusion about whether or not their products continue to be dolphin safe. **The three U.S. brands want to reassure consumers they have no reason to be concerned that their companies are wavering in their commitment to providing dolphin safe tuna as a result of this ruling. These companies do not and will not utilize tuna caught in a manner that harms dolphins. Providing consumers with sustainable and dolphin safe tuna remains a top priority.**

*See* States News Service Press Release, May 31, 2012 (emphasis added).

36.     Following the Appellate Body's Report and recommendations to strengthen the DPCIA, the United States made amendments to it that imposed additional requirements on tuna caught outside the ETP.  These amendments required that:

> **all tuna sought to be entered into the United States as "dolphin-safe", regardless of where it was caught or the nationality of the fishing vessel, must be accompanied by a certification that (a) no nets were intentionally set on dolphins in the set in which the tuna was caught; and (b) no dolphins were killed or seriously injured in the sets in which the tuna was caught.**

*See* Official Summary, WTO DS381, current through Jan. 31, 2019 (emphasis added), *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm (last visited

May 10, 2019).

## Bumble Bee's Fishing Practices and Violation of its
## Dolphin Safe Representations

37.     Several tuna companies use traditional pole-and-line and trolling methods of catching tuna.  These products include Safe Catch, Ocean Naturals (for its Albacore tuna), and Wild Planet, which are caught using pole-and-line and trolling, and American Tuna, Whole Foods 365 Everyday Value brand (for its skipjack and albacore tuna), and Trader Joe's (for its yellowfin tuna), which are caught using exclusively pole-and-line.[2]

38.     While more costly, these traditional methods ensure that dolphins (and other bycatch) are not harmed in the fishing process because fish are caught using barbless hooks and poles one at a time near the sea's surface and unintended captured species are easily released.  Tuna caught by these methods are actually "dolphin safe."

39.     Bumble Bee uses pole-and-line fishing methods to capture the tuna in its Wild Selections premium brand tuna products and prominently identifies "line caught" as the catch method used on the front and center of the product labels. Bumble Bee does not, however, use only dolphin safe pole-and-line or trolling techniques to capture the tuna in its flagship Bumble Bee branded tuna products that

---

[2] *See* Safe Catch, The Safe Catch Way, *available at* https://safecatch.com/ (last visited May 3, 2019); Ocean Naturals, Albacore, Responsibly Caught, *available at* https://oceannaturals.com/responsibly-caught/albacore-tuna/ (last visited May 3, 2019); Wild Planet, Good to the Core, Products-Tuna, *available at* https://www.wildplanetfoods.com/products/tuna/ (last visited May 3, 2019); American Tuna, American Tuna, Home, available at https://americantuna.com/ (last visited May 3, 2019); Whole Foods Market, Wild, Salt Added Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-wild-salt-added-tuna-10e1c0 (last visited May 3, 2019); Whole Foods Market, Albacore Wild Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-albacore-wild-tuna-5-oz-b83f86 (last visited May 3, 2019); Trader Joe's, About Trader Joe's Seafood, Announcements>Customer Updates (July 17, 2013), *available at* https://www.traderjoes.com/announcement/a-note-to-our-customers-about-trader-joes-seafood (last visited May 3, 2019).

are the subject of this lawsuit. Nor does Bumble Bee identify the dolphin harming fishing methods it does use on the tuna product labels even though Defendant acknowledges it is capable of tracing the fishing gear employed to capture the tuna. Bumble Bee, Trace My Catch, *available at* http://www.bumblebee.com/tracemycatch/ (last visited May 7, 2019).

40. While not disclosed on the product labels, Defendant's website identifies purse seine nets and longlines as the methods used to capture the tuna in its Bumble Bee branded products. Bumble Bee, Tuna 101, About Us, *available at* http://www.bumblebee.com/about-us/seafood-school/tuna-101/ (last visited May 7, 2019). Both of these fishing methods kill and harm substantial numbers of dolphins.

41. Longlines consist of a 40-80 mile long main line to which many smaller branch lines with baited hooks are attached to catch tuna. Longlines are highly indiscriminate fishing gear as they attract large numbers of target and non-target fish, as well as dolphins, that get snagged on the hooks by their mouth or other body parts when they go after the bait and then remain on the line for extended periods of time as the lines are drawn in to the vessel and the catch is obtained. The hooked fish are retrieved by mechanically pulling the main line back onto the fishing vessel, which can take 10 hours. As dolphins are oxygen breathers, most do not survive the 10-hour retrieval process.

42. Even when dolphins are mistakenly caught by these longlines, they are often not released. Rather, the fishermen that catch these dolphins often kill them onboard and have been photographed posing with their catch, mutilating the dolphins and removing their teeth, which can be used as currency. Because of the harm caused to non-target fish, longlines have been condemned by environmental groups like the World Wildlife Foundation ("WWF") as an unsustainable fishing practice WWF, Bycatch, Threats, *available at* www.worldwildlife.org/threats/bycatch (last visited May 3, 2019).

43.    Purse seine nets also trap, kill, and harm substantial numbers of dolphins.  Because purse seine nets can reach more than 6,500 feet in length and 650 feet deep – the equivalent of 18 football fields by 2 football fields[3] – they often entrap dolphins when drawn closed, particularly because many of the purse seine fishing vessels use free floating rafts of flotsam known as fish aggregating devices, or FADs, to capture tuna.  Bumble Bee, Sustaining Fisheries, Sustainability, *available at* http://www.bumblebee.com/sustainability/fisheries/ (last visited May 8, 2019) ("we source skipjack and yellowfin from purse seiners who utilize non-entangling Fish Aggregating Devices (FAD) designs.").

44.    FADs are known as floating death traps because dolphins and other marine life get entangled in the devices.  Even though Defendant states it recently began sourcing some of its tuna from purse seiners utilizing non-entangling FADs (*id.*), their sheer numbers estimated at 30,000 to 50,000 per year disrupt behavior and movement patterns of dolphins and other ocean species crucial to their survival.  And, as most FADs are not removed after use, they pollute the oceans in direct conflict with Defendant's proclaimed goal of "ensuring safer, cleaner oceans" as part of its commitment to sustainable fishing practices.  *Id.*

45.    While FADs are extremely effective at luring tuna, they also attract dolphins – particularly in the ETP where Defendant sources some of its tuna[4] as schools of tuna routinely gather beneath schools of dolphins to reduce the risk of predation.  So, even if the particular FAD is net-free, the tuna, dolphins, and other marine life are all then caught in the gigantic mile circumference purse seine nets that are deployed around the FAD to catch the tuna.

---

[3] Elizabeth Brown, Fishing Gear 101: Purse Seines – The Encirclers (June 6, 2016), *available at* http://safinacenter.org/2015/12/fishing-gear-101-purse-seines-the-encirclers/ (last visited May 3, 2019) ("Brown 2016").
[4] Bumble Bee, Tuna 101, About Us, *available at* http://www.bumblebee.com/about-us/seafood-school/tuna-101/ (last visited May 8, 2019).

Class Action Complaint

46.    Since the 1980s, changes in the design of nets and fishing practices that allow dolphins to escape the net have significantly reduced dolphin mortality. Brown 2016.    Nonetheless, significant numbers of dolphins (over a thousand a year according to NOAA[5]) are still harmed by this method, as unintended bycatch can account for more than 30% of a ship's haul.  And, even though unintended bycatch may still be alive when dumped out of the nets onto the boat, by the time they are thrown back into the ocean, most are dead or near dead.

47.    Even when dolphins escape the purse seine nets or are released alive from the longlines and nets, dolphins are harmed by these fishing practices.

48.    Several studies have observed a number of indirect ways these fishing practices cause additional unobserved dolphin deaths, including: dolphin mother-calf separation as calves are dependent upon their mothers until weaned 1.5 years postpartum, and, even then, the calves do not reach full muscle maturation until age 3; acute cardiac and muscle damages caused by the exertion of avoiding or detangling from the FADs and purse seine nets; cumulative organ damage in released dolphins due to overheating from escape efforts; failed or impaired reproduction; compromised immune function; and unreported mortalities due to under-counting by purse-seine fishing vessels. *See, e.g.*, Department of Commerce, Reilly, *et al.*, <u>Report of the Scientific Research Program Under the International Dolphin Conservation Program Act</u>, NOAA Technical Memorandum NMFS (March 2005), at 67-71, 76 *available at* https://swfsc.noaa.gov/publications/TM/SWFSC/NOAA-TM-NMFS-SWFSC-372.PDF (last visited May 3, 2019).  *See also* Wade, et al., *Depletion of spotted and spinner dolphins in the eastern tropical Pacific: modeling hypotheses for their lack of recovery*, Mar Ecog Prog Ser 343:1-14, 2007, at 11 (noting "[a] summary of recent research … clearly illustrates that the purse seine fishery has the capacity

---

[5] NOAA 2016.

to affect dolphins beyond the direct mortality observed as bycatches"); Kellar, et al., *Pregnancy patterns of pantropical spotted dolphins (Stenella attenuata) in the eastern tropical Pacific determined from hormonal analysis of blubber biopsies and correlations with the purse-seine tuna fishery*, Mar Biol (2013) 160:3113-3124, at 3120 (tuna fishery reduces likelihood of female becoming pregnant or maintaining pregnancy).

49.    As the indirect harmful effects of Defendant's fishing practices also "likely result in [dolphin] mortality" (50 CFR §216.3), Defendant's tuna is not dolphin safe.  It is conservatively estimated that total reported dolphin mortality is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins given these indirect harmful effects and unobserved and underreported kills. Reilly, *et al.*, 2005, at 7.

50.    Because the use of FADs, purse seine nets, and longlines are unsustainable fishing practices, several companies that supply the U.S. tuna market will not source their tuna from boats that use these indiscriminate fishing methods. But Bumble Bee is not among these companies.  While Defendant emphasizes on its website that post January 1, 2016 it began "increasing sourcing of tuna caught by vessels on the International Seafood Sustainability Foundation (ISSF) Proactive Vessel Register (PVR)" as an "effective, credible, and verifiable way to identify those purse seine vessels that are taking meaningful sustainability efforts to improve responsible practices in tuna fishing and that are in compliance with ISSF Multi-Annual Commitments"[6]; as stated on the PVR website under the "FAQ" header, all vessels are eligible for the registry regardless of the fishing method used[7], such that

---

[6]    Bumble    Bee,    <u>Sustaining    Fisheries</u>,    Sustainability,    *available    at* http://www.bumblebee.com/sustainability/fisheries/ (last visited May 7, 2019).
[7] ISSF, <u>About the PVR</u>, ProActive Vessel Register, *available at* https://iss-https://iss-foundation.org/knowledge-tools/databases/proactive-vessel-register/ (last visited May 7, 2019).

a vessel's PVR designation does not indicate it uses sustainable fishing methods. In fact, compliance with the ISSF Conservation Measures of relevance here is determined by "remote" audits once every three years wherein vessel owners self-attest either directly or electronically that no driftnets are used, FADs are non-entangling, no shark finning is occurring, and they are not on the RFMD Illegal, Unreported and Unregulated vessel list. ISSF, Audits, ProActive Vessel Register, available at https://iss-foundation.org/knowledge-tools/databases/proactive-vessel-register/ (last visited May 8, 2019); MRAG Americas, ISSF ProActive Vessel Register: Audit Policy Document & Standard Operating Procedures For Purse Seine Vessels (March 2018, updated September 2018), *available at* https://iss-foundation.org/download-monitor-demo/download-info/issf-proactive-vessel-register-pvr-audit-policy-document-standard-operating-procedures-for-purse-seine-vessels-september-2018/ (last visited May 8, 2018); MRAG Americas, ISSF ProActive Vessel Register: Audit Policy Document & Standard Operating Procedures For Longline Vessels Vessels (March 2018, updated September 2018), *available at* https://iss-foundation.org/download-monitor-demo/download-info/issf-proactive-vessel-register-pvr-audit-policy-document-standard-operating-procedures-for-longline-vessels-september-2018/ (last visited May 8, 2018). "Dolphin" and "bycatch" are not mentioned at all in the Audit Protocols. And the use of non-entangling FADs, longlines, and purse seine nets are all permissible practices not subject to audit. *See id.*

51. Further belying its supposed commitment to sustainable fishing practices is that, to avoid competition from its primary market rivals over the sale of FAD-free tuna (which would be more expensive), in or about February 2012, Bumble Bee allegedly entered into a written agreement with Chicken of the Sea and StarKist Co., who together with Defendant control 70-80% of the U.S. canned tuna market, whereby none of them would sell a branded FAD-free tuna product in the U.S. *See*

Tom Seaman, Lawsuits: US brands colluded on not selling FAD-free tuna, undercurrentnews>analysis>US Investigates Tuna Brands>Companies (July 18, 2016), *available at* https://www.undercurrentnews.com/2016/07/18/lawsuits-us-brands-colluded-on-not-selling-fad-free-tuna/ (last visited May 3, 2019).

52.    Because "Bumble Bee does not offer any responsibly-caught options", "has not made a commitment to introduce responsibly caught products under its flagship brand", and does not indicate on the product labels how the tuna was caught, Greenpeace has consistently ranked Defendant near the bottom of its list of well-known tuna brands when it comes to responsible sourcing of tuna.  Greenpeace, 2017 Tuna Shopping Guide, *available at* https://www.greenpeace.org/usa/oceans/tuna-guide/ (last visited May 3, 2019) (ranking Bumble Bee 17th out of 20).

### Bumble Bee Does Not Track and Report the Numbers of Dolphins Killed or Maimed in Capturing Its Tuna

53.    Defendant's use of an alternative dolphin safe logo on its tuna products requires it to track, audit, and spot check for accuracy that "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught" from capture, to transshipment[8], to cannery, to shelf.  And, in the event that even a single dolphin is "killed or seriously injured" during the catch, Defendant must physically separate and store that catch from any tuna catches in which no dolphins were harmed (if any) and maintain records tracing the catch(es) in which dolphins were harmed back to the fishing vessel and trip.  50 CFR §216.91.

54.    Defendant sources its tuna globally in all oceans.  Bumble Bee, Tuna 101, About Us, *available at* http://www.bumblebee.com/about-us/seafood-

---

[8] Transfer of a shipment from one carrier, or more commonly, from one vessel to another whereas in transit. Transshipments are usually made (1) where there is no direct air, land, or sea link between the consignor's and consignee's countries, (2) where the intended port of entry is blocked, or (3) to hide the identity of the port or country of origin.  Business Dictionary, transshipment, *available at* http://www.businessdictionary.com/definition/transshipment.html (last visited May 3, 2019).

school/tuna-101/ (last visited May 8, 2019).  Unlike fisheries in the ETP, boats in the other oceanic regions that supply Bumble Bee tuna are not required to have independent observers onboard to track and report the number of dolphins killed or seriously injured.  16 U.S.C. §1385(d)(1).  A declaration from the ship's captain that no purse seines were intentionally set on dolphins suffices.  16 U.S.C. §1385(d)(1)(B).  These declarations are limited to certifying that "no purse seine net was intentionally deployed on or used to encircle dolphins during the particular voyage on which the tuna was harvested" and do not require certification that FADs, gillnets, longlines and other dolphin harming fishing techniques were not used.  Nor must the captain quantify the number of dolphins killed or otherwise harmed.  There is a strong financial incentive for a captain to falsely certify a catch is "dolphin safe," as any catch that is not "dolphin safe" is essentially worthless.  Defendant acknowledges "there is currently no existing standard or credible audit process for the challenging and often remote operation of tuna fishing vessels."  Bumble Bee, Social          Responsibility,          Sustainability,          *available          at* http://www.bumblebee.com/sustainability/social-responsibility/ (last visited May 7, 2019).

55.    Further, while Defendant claims that all of its tuna products meet the dolphin safe labeling standards of the Earth Island Institute ("EII")[9], including dolphin-friendly sourcing, EII's tuna monitoring program does not guarantee that no dolphins were killed or seriously injured by Bumble Bee tuna vessels.  EII's list of "verified dolphin-safe companies" is based on supplier "commitments" to not chase and encircle dolphins during their fishing trips.  *See* David Phillips, International Marine Mammal Project, Earth Island Institute International Tuna Monitoring Program   2014   Annual   Report   (August   19,   2015),   *available   at*

---

[9] Bumble Bee, Current Topics, FAQ, *available at* http://www.bumblebee.com/faqs/ (last visited May 8, 2019).

http://savedolphins.eii.org/news/entry/2014-annual-report-international-tuna-monitoring-report (last visited May 8, 2019).  EII does not have the resources to monitor all the vessels supplying Defendant's tuna, let alone each and every fishing trip made by those vessels.  Further, as evidenced by the "commitment" it requires of its suppliers, EII's focus is on ensuring dolphins are not chased and encircled.  *Id.* Suppliers' use of FADs, longlines, and other destructive fishing methods is not a bar to verification.  In fact, EII expressly states that it is not opposed to the use of FADs. *Id.*

56.   By purchasing its tuna from fishing vessels that use purse seine nets deployed around FADs and/or longlines, Bumble Bee is able to reduce its tuna product costs by using less costly fishing methods that kill or harm dolphins.  This enables Bumble Bee to sell its tuna products at a lower price and capture more of the declining tuna market, which has experienced a 40% per capita decline over the last 30 years.

**Bumble Bee's Sustainable Fishing Practices Misrepresentations**

57.   Defendant's commitment to sustainable fishing practices, including dolphin safe sourcing, is the common message in its widespread and long-term advertising campaign as "the responsible harvesting and management of fisheries from which we source – [] is not only important to the environment and our consumers, but for our business as well."  Bumble Bee, Sustaining Fisheries, Sustainability, *available at* http://www.bumblebee.com/sustainability/fisheries/ (last visited May 7, 2019).  On its website, Defendant says its "goal" is "to source all of our seafood products sustainably", which means, in part, "that the fishery is managed using science and data and takes into account any impact of fishing on related species and ecosystems." *Id.*

58.   Defendant claims its membership in the International Seafood Sustainability Foundation ("ISSF") is the "primary channel" for accomplishing its

sustainable fishing practices goals.  Bumble Bee, Tuna 101, About Us, *available at* http://www.bumblebee.com/about-us/seafood-school/tuna-101/ (last visited May 7, 2019).  Despite its organization name and purported sustainable fishing practice mission, the ISSF does not support the banning or effective control of FADs, longlines, or other unsustainable fishing techniques.

59.    The ISSF lacks the independence and impartiality to embrace and champion meaningful sustainability practices and industry reform.  It was created in 2009 by Bumble Bee and several other big tuna companies and its funding comes from corporate fees which are several hundreds of thousands of dollars for large companies like Bumble Bee.  As noted by Greenpeace when refusing an invite to join ISSF's Environmental Stakeholder Committee, the "ISSF's role [is] to deflect attention from the real problems, and to delay adoption of real solutions that its corporate members would prefer to avoid" such as banning FADs and other harmful fishing techniques that its corporate members use and simply allows its members "to brandish their ISSF membership as a way to deflect criticism." Greenpeace, How the International Seafood Sustainability Foundation (ISSF) Blocks Environmental Action, *available at* https://www.greenpeace.org/usa/oceans/sustainable-seafood/how-international-seafood-sustainability-foundation-blocks-environmental-action/ (last visited May 3, 2019).

60.    Because Bumble Bee uses longlines, purse seine nets, FADs, and other well-known dolphin-harming fishing techniques, notwithstanding its ISSF membership, Bumble Bee's sustainability representations are false, misleading, and/or deceptive.

### **Bumble Bee, Unlike Many Other Tuna Companies, Does Not Use Dolphin Safe Tuna Fishing Methods**

61.    Unlike several other tuna companies who sell to the U.S. market, Defendant has not adopted dolphin safe fishing practices for its flagship Bumble Bee

branded tuna products, such as pole-and-line, trolling, and/or handline catch methods, whereby fishermen catch one fish at a time and release unwanted species soon after a fish takes the bait.

62.     Most U.S. retailers have sustainability guidelines and expectations of their seafood suppliers that include: using recognized dolphin safe tuna capture methods, having programs in place to trace the tuna back to the boat and place of capture, and guaranteeing the catch method used.  *See, e.g.*, Whole Foods Market, Sustainable Canned Tuna, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited April 17, 2019); Whole Foods Market, Canned Tuna Sourcing Policy, *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited April 17, 2019); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna (February 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited April 17, 2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015), at 3, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited May 3, 2019) ("Safeway-Albertsons will strive to purchase environmentally preferable products"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited May 3, 2019); Sprouts, Sustainable Seafood Policy, *available at* https://about.sprouts.com/product-sourcing/sustainable-seafood-policy/ (last visited April 17, 2019); Giant Eagle, Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited April 17, 2019) ("Our goal is to source tuna only from healthy and well-managed stocks, from fisheries using the most current best practice in methods, bycatch

reduction and environmentally responsible, socially responsible, Non GMO, BPA free and priced reasonably for our consumers"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited April 17, 2019); Publix, Publix Sustainability Report 2019, *available at* https://sustainability.publix.com/wp-content/uploads/sustainability-report.pdf (last visited April 17, 2019) (supplier commitment to sustainable fishing "helps us decide whether to sell a product, enhance fisheries through improvement projects or halt the sale of a product until the issue is resolved.").  Tuna companies who do not use dolphin safe catch methods and do not adhere to traceability requirements can expect retailers to refuse to sell their products.

63.     By expressing a commitment to sustainability, labeling its tuna products as dolphin safe, not tracking and reporting the number of dolphins killed and harmed in capturing its tuna, and not separating tuna that is not dolphin safe from tuna caught where no dolphins were harmed (if any), Defendant is able to sell its Bumble Bee tuna products in several major retail stores to which it would otherwise be denied entry.

**Bumble Bee's Dolphin Safe Sustainability Representations are False, Misleading, and/or Deceptive**

64.     Because dolphins are killed and harmed by the fishing methods used to catch the tuna in Defendant's products; Defendant does not adequately track, verify, audit, and spot check the number of dolphins killed and harmed; and Defendant does not separately store the tuna that is not dolphin safe, Bumble Bee's use of the alternative dolphin safe logo, its dolphin safe representations, and its sustainability representations are false, misleading, and/or deceptive.

65.     Reasonable consumers rightly believe that "dolphin safe" means "no" dolphins were harmed in the process of catching the tuna in Defendant's products.

1    That is precisely the regulatory definition of dolphin safe.  50 CFR §§216.3, 216.91.

2    And it is the message that Bumble Bee has consistently conveyed to the public in its

3    widespread and long-term advertising and marketing campaign.

4         66.    Dolphin safety matters to consumers and it materially affects their

5    decision whether to purchase Bumble Bee tuna.  So too does the use of sustainable

6    fishing practices that, among other things, minimize the amount of unwanted

7    bycatch.  If consumers knew Bumble Bee's tuna products were not dolphin safe

8    and/or not caught using sustainable fishing methods they would not buy Defendant's

9    products, particularly because there are several competing brands of like tuna

10   products that are dolphin safe and sustainably sourced – including Bumble Bee's own

11   premium Wild Selections branded tuna products. Thus, Plaintiffs and Class members

12   are entitled to a full refund.

13        67.    Any nutrient value notwithstanding, because Defendant's false dolphin

14   safe representations and/or unsustainable catch methods taint the entire purchase –

15   from whether Bumble Bee tuna that was not dolphin safe and/or not sustainably

16   caught would even be sold by retailers to whether consumers would purchase Bumble

17   Bee tuna that was not dolphin safe and /or sustainably caught if available for purchase

18   – consumers, like Plaintiffs here, are entitled to a full refund.  The importance

19   consumers place upon dolphin safety and their abject distaste for indiscriminate and

20   destructive fishing methods makes tuna fish consumers no different from Hindus

21   attributing zero value to beef products, or vegans attributing zero value to animal

22   products, or vegetarians attributing zero value to meat, fish, and poultry, no matter

23   what nutritive value these products may otherwise have. Further, if the retailers of

24   Defendant's tuna products knew they were not sustainably sourced and dolphin safe,

25   they would refuse to sell Defendant's tuna products.  This too entitles Plaintiffs and

26   Class members to a full refund.

27        68.    Alternatively, Plaintiffs and Class members are entitled to the premium

28
                                    - 24 -

attributable to the dolphin safe and sustainable fishing practices misrepresentations.

69.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who purchased the tuna products to halt the dissemination of this false, misleading, and deceptive advertising message, correct the misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the tuna products. Based on Defendant's unjust enrichment and violations of California, Florida, Arizona, New York, New Jersey, and Maryland unfair competition laws (detailed below), Plaintiffs seek damages, declaratory, injunctive, and restitutionary relief for consumers who purchased the tuna products.

## JURISDICTION AND VENUE

70.    This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some members of the Class are citizens of a state different from Defendant.

71.    This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct and do business in California, including this District. Defendant marketed, promoted, distributed, and sold the tuna products in California, and Defendant has sufficient minimum contacts with this State and/or sufficiently availed itself of the markets in this State through its promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

72.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events giving rise to Plaintiff Duggan's claims occurred while she resided in this judicial district.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

**PARTIES**

73.   Plaintiff Tara Duggan resides in Marin County, California and is a citizen of California.  Throughout the relevant period, Plaintiff Duggan routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned tuna in water at stores such as Lucky's and Fairfax Market in her area.  Plaintiff Duggan purchased the tuna products for approximately $3.50.  At all relevant times, Plaintiff Duggan was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Duggan known the tuna was not dolphin safe and/or had Defendant not represented the tuna was dolphin safe, Plaintiff Duggan would not have purchased the tuna products.  As a result, Plaintiff Duggan suffered injury in fact and lost money at the time of purchase.  Plaintiff Duggan continues to desire to purchase Bumble Bee products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the tuna product. Indeed, Plaintiff Duggan regularly visits stores such as Lucky's and Fairfax Market where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

74.   Plaintiff Lori Myers resides in Moreno Valley, California and is a citizen of California.  Throughout the relevant period, Plaintiff Myers routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned and pouched tuna in water through Instacart, Amazon, and at Ralphs in Canyon Crest Town Center in Riverside, California.  Plaintiff Myers purchased the tuna products many times throughout the

Class Action Complaint

relevant period.  At all relevant times, Plaintiff Myers was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Myers known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Myers would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Myers suffered injury in fact and lost money at the time of purchase.  Plaintiff Myers continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Myers regularly purchases online and visits stores such as Ralphs and Stater Brothers, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

75.     Plaintiff Angela Cosgrove resides in Pompano Beach, Florida and is a citizen of Florida.  Throughout the relevant period, Plaintiff Cosgrove routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned tuna in water and canned yellowfin tuna at various stores in her area, including Publix and Walmart.  Plaintiff Cosgrove purchased the canned tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Cosgrove believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Cosgrove known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Cosgrove would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Cosgrove suffered injury in fact and

Class Action Complaint

lost money at the time of purchase.  Plaintiff Cosgrove continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Cosgrove regularly visits stores such as Publix and Walmart, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

76.    Plaintiff Robert McQuade resides in Bronxville, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Robert McQuade routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including tuna in pouches in water, at stores like Shop-Rite in Yonkers, New York, and Eastchester, New York, and ACME in Bronxville, New York.  Plaintiff Robert McQuade purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Robert McQuade believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Robert McQuade known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Robert McQuade would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Robert McQuade suffered injury in fact and lost money at the time of purchase.  Plaintiff Robert McQuade continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase

whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Robert McQuade regularly visits stores such as Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

77.    Plaintiff Colleen McQuade resides in Bronxville, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Colleen McQuade routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including tuna in pouches in water, at stores like Shop-Rite in Yonkers, New York, and Eastchester, New York, and ACME in Bronxville, New York.  Plaintiff Colleen McQuade purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Colleen McQuade believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Colleen McQuade known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Colleen McQuade would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Colleen McQuade suffered injury in fact and lost money at the time of purchase.  Plaintiff Colleen McQuade continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Colleen McQuade regularly visits stores such as Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin

Class Action Complaint

safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

78.     Plaintiff James Borruso resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Borruso routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water or oil, at stores like Stop & Shop in Staten Island, New York.  Plaintiff Borruso purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Borruso believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Borruso known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Borruso would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Borruso suffered injury in fact and lost money at the time of purchase.  Plaintiff Borruso continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Borruso regularly visits stores such as Stop & Shop where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

79.     Plaintiff Robert Nugent resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Nugent routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned

Class Action Complaint

tuna in water, at stores like Stop & Shop in Staten Island, New York. Plaintiff Nugent purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Nugent believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Nugent known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Nugent would not have purchased the Bumble Bee tuna products. As a result, Plaintiff Nugent suffered injury in fact and lost money at the time of purchase. Plaintiff Nugent continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Nugent regularly visits stores such as Stop & Shop, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

80. Plaintiff Anthony Luciano resides in Eastchester, New York and is a citizen of New York. Throughout the relevant period, Plaintiff Anthony Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water and oil, at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle, and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown, and Costco. Plaintiff Anthony Luciano purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Anthony Luciano believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods

Class Action Complaint

that are harmful to dolphins.  Had Plaintiff Anthony Luciano known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Anthony Luciano would not have purchased the Bumble Bee tuna products. As a result, Plaintiff Anthony Luciano suffered injury in fact and lost money at the time of purchase.  Plaintiff Anthony Luciano continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Anthony Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown, and Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

81.     Plaintiff Lori Luciano resides in Eastchester, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Lori Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water and oil, at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle, and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown, and Costco.  Plaintiff Lori Luciano purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Lori Luciano believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Lori Luciano known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Lori Luciano would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Lori

Class Action Complaint

Luciano suffered injury in fact and lost money at the time of purchase.  Plaintiff Lori Luciano continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Lori Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown, and Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

82.     Plaintiff Fidel Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Fidel Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned tuna products, including canned tuna in water, at stores like Costco in New Rochelle, New York.  Plaintiff Fidel Jamelo purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Fidel Jamelo believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Fidel Jamelo known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Fidel Jamelo would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Fidel Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Fidel Jamelo continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether

no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Fidel Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

83.     Plaintiff Jocelyn Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Jocelyn Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned tuna products, including canned tuna in water, at stores like Costco in New Rochelle, New York.  Plaintiff Jocelyn Jamelo purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Jocelyn Jamelo believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Jocelyn Jamelo known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Jocelyn Jamelo would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Jocelyn Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Jocelyn Jamelo continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Jocelyn Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is

Class Action Complaint

dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

84.     Plaintiff Robert Lantos resides in Eatontown, New Jersey and is a citizen of New Jersey.   Throughout the relevant period, Plaintiff Lantos routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water, at stores like Costco in Eatontown, New Jersey, and ACME in Shrewsbury, New Jersey  Plaintiff Lantos purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Lantos believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Lantos known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Lantos would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Lantos suffered injury in fact and lost money at the time of purchase.  Plaintiff Lantos continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Lantos regularly visits stores such as Costco and ACME, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

85.     Plaintiff Amar Mody resides in Jersey City, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Amar Mody routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by

Class Action Complaint

viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water, at stores like Shop Rite and ACME in Jersey City, New Jersey. Plaintiff Amar Mody purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Amar Mody believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Amar Mody known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Amar Mody would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Amar Mody suffered injury in fact and lost money at the time of purchase.  Plaintiff Amar Mody continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Amar Mody regularly visits stores such as Shop Rite and ACME, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

86.     Plaintiff Heena Mody resides in Jersey City, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Heena Mody routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including canned tuna in water, at stores like Shop Rite and ACME in Jersey City, New Jersey. Plaintiff Heena Mody purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Heena Mody believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as

Class Action Complaint

represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Heena Mody known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Heena Mody would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Heena Mody suffered injury in fact and lost money at the time of purchase.  Plaintiff Heena Mody continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Heena Mody regularly visits stores such as Shop Rite and ACME, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

87.     Plaintiff Avraham Isac Zelig resides in Manalapin, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Zelig routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee canned tuna products, including canned tuna in water, at various stores, including Shop-Rite in Marlboro, New Jersey. Plaintiff Zelig purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Zelig believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Zelig known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Zelig would not have purchased the Bumble Bee tuna products. As a result, Plaintiff Zelig suffered injury in fact and lost money at the time of purchase.  Plaintiff Zelig continues to desire to purchase Bumble Bee tuna products

that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Zelig regularly visits stores such as Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

88.     Plaintiff Denese Depeza resides in Martinsburg, West Virginia and is a citizen of West Virginia  Throughout the relevant period, Plaintiff Depeza routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Bumble Bee tuna products, including White Albacore in cans, at stores like Costco in Frederick, Maryland. Plaintiff Depeza purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Depeza believed the tuna products were dolphin safe and was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Depeza known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Depeza would not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Depeza suffered injury in fact and lost money at the time of purchase.  Plaintiff Depeza continues to desire to purchase Bumble Bee tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Depeza regularly visits stores such as Costco where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the

Class Action Complaint

1   products is dolphin safe and was caught using fishing methods that do not harm

2   dolphins when deciding whether to purchase the tuna products in the future.

3       89.     Plaintiff Kathleen Miller resides in Scottsdale, Arizona and is a citizen

4   of Arizona.  Throughout the relevant period, Plaintiff Miller routinely was exposed

5   to, saw, and relied upon Defendant's dolphin safe representations by viewing the

6   dolphin safe mark on the Bumble Bee canned tuna in water at Albertson's and Fry's

7   in Phoenix and Scottsdale, Arizona.  Plaintiff Miller purchased the canned tuna

8   products many times throughout the relevant period.  At all relevant times, Plaintiff

9   Miller believed the tuna products were dolphin safe and was unaware that the tuna

10  was not dolphin safe as represented and was caught using fishing methods that are

11  harmful to dolphins.  Had Plaintiff Miller known the tuna was not dolphin safe and/or

12  had Defendant not represented that the tuna was dolphin safe, Plaintiff Miller would

13  not have purchased the Bumble Bee tuna products.  As a result, Plaintiff Miller

14  suffered injury in fact and lost money at the time of purchase.  Plaintiff Miller

15  continues to desire to purchase Bumble Bee tuna products that contain dolphin safe

16  tuna caught using fishing methods that do not harm dolphins, and she would purchase

17  such a product manufactured by Defendant if it were possible to determine prior to

18  purchase whether no dolphins were harmed in capturing the tuna in the product.

19  Indeed, Plaintiff Miller regularly visits stores such as Fry's, where Defendant's tuna

20  products are sold, but will be unable to rely upon the dolphin safe representations and

21  will not be able to determine if the tuna in the products is dolphin safe and was caught

22  using fishing methods that do not harm dolphins when deciding whether to purchase

23  the tuna products in the future.

24      90.     Defendant Bumble Bee Foods LLC is a Delaware limited liability

25  company with its headquarters and principal place of business located at 280 Tenth

26  Ave, San Diego, CA, 92101, and is a citizen of Delaware and California. Bumble

27  Bee operates its tuna processing facility in San Diego, California.  During the time

28                              - 39 -

period relevant to Plaintiffs' claims, Bumble Bee: produced and sold canned tuna and tuna pouches throughout the United States and its territories; sold canned tuna and tuna pouches to Plaintiffs and others in the United States; and engaged in the false, misleading, and deceptive advertising alleged in this Complaint.

## CLASS DEFINITION AND ALLEGATIONS

91.    Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure and seek certification of the following Class:

**Nationwide Class**
All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products in the United States.

Excluded from this Class are Defendant and its officers, directors, employees and those who purchased the tuna products for the purpose of resale.

92.    Alternatively, Plaintiffs Duggan and Myers seek certification of the following California-Only Class:

**California-Only Class**
All California consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

93.    In addition, Plaintiff Cosgrove seeks certification of the following Florida-Only Class:

**Florida-Only Class Action**
All Florida consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

94.     In addition, Plaintiffs Borruso and Nugent, Plaintiffs Anthony and Lori Luciano, Plaintiffs Fidel and Jocelyn Jamelo, and Plaintiffs Robert and Colleen McQuade seek certification of the following New York-Only Class:

**New York-Only Class**
All New York consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

95.     In addition, Plaintiffs Lantos and Zelig and Plaintiffs Amar and Heena Mody seek certification of the following New Jersey-Only Class:

**New Jersey-Only Class**
All New Jersey consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

96.     In addition, Plaintiff Depeza seeks certification of the following Maryland-Only Class:

**Maryland-Only Class**
All Maryland consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

97.     In addition, Plaintiff Miller seeks certification of the following Arizona-Only Class:

**Arizona-Only Class**
All Arizona consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

98. **Numerosity**. The members of the Classes are so numerous that their joinder is impracticable. Plaintiffs are informed and believe that the proposed Classes contain thousands of purchasers of the tuna products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

99. **Existence and Predominance of Common Questions of Law and Fact**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Defendant's dolphin safe representations and sustainable fishing practices representations are false, misleading, and/or objectively reasonably likely to deceive;

(b) whether Defendant failed to comply with traceability and verification requirements;

(c) whether Defendant engaged in fishing practices that harmed dolphins;

(d) whether Defendant's alleged conduct is unlawful;

(e) whether the alleged conduct constitutes violations of the laws asserted;

(f) whether Defendant engaged in false, misleading and/or deceptive advertising; and

(g) whether Plaintiffs and Class members are entitled to appropriate remedies, including damages, restitution, corrective advertising, and injunctive relief.

100. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members were injured through the uniform misconduct described above. Plaintiffs are also advancing the same claims

and legal theories on behalf of themselves and all Class members.

101.  **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

102.  **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

103.  Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to enjoin and prevent Defendant from engaging in the acts described and requiring Defendant to provide full restitution to Plaintiff and Class members.

104.  Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and Class members.

105.  Unless an injunction is issued, Defendant will continue to commit the

violations alleged, and the members of the Classes and the general public will continue to be deceived and not know whether the dolphin safe representations and/or sustainable fishing methods representations are true or if the tuna products continue to contain tuna caught using fishing methods that are harmful to dolphins.

106.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to: (a) whether Defendant marketed and sold its tuna products as "Dolphin Safe" when they were not; (b) whether Defendant's conduct was unlawful, unfair, or fraudulent in violation of state consumer protections law; (c) whether Defendant's misrepresentations would deceive a reasonable consumer; (d) whether Defendant has been unjustly enriched; (e) whether Defendant failed to comply with federal law in branding its tuna products "Dolphin Safe"; and (f) whether Defendant's misrepresentations regarding its tuna products would be material to a reasonable consumer.

## COUNT I
### Violation of Business & Professions Code §§17200, *et seq.*
### (On Behalf of the Nationwide or California-Only Class)

107.   Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

108.   Plaintiffs bring this claim individually and on behalf of the Nationwide or California-Only Classes.

109.   The Unfair Competition Law, Business & Professions Code §§17200, *et seq*. ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.  More specifically, the UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful,

unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ..”

110.  **Unlawful Business Practices:** In the course of conducting business, Defendant committed “unlawful” business practices in violation of the UCL by, *inter alia*, making the dolphin safe representations and sustainable fishing methods representations which are false, misleading, and/or deceptive (which also constitute advertising within the meaning of §17200; failing to comply with traceability and verification requirements, as set forth more fully herein; and violating California Civil Code §§1572, 1573, 1709, and 1711; the California Legal Remedies Act, California Civil Code §§1750, *et seq.*; California Business & Professions Code §§17200, *et seq.* and 17500, *et seq.*, and 16 U.S.C. §1385.

111.  Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

112.  **Unfair Business Practices:** In the course of conducting business, Defendant committed “unfair” business acts or practices by, *inter alia*, making the dolphin safe representations and sustainable fishing method representations which are false, misleading, and/or deceptive (which also constitute advertising within the meaning of §17200), and failing to comply with traceability and verification requirements, as set forth more fully herein.  There is no societal benefit from false advertising, only harm. While Plaintiffs and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and/or deceptive representations as it unfairly enticed Plaintiffs and Class members to purchase its tuna products instead of similar tuna products sold by other manufacturers that were dolphin safe, sustainably caught, stored separately from non-dolphin safe tuna, traceable, and verified.  Because the utility of Defendant’s conduct (zero) is outweighed by the gravity of harm to Plaintiffs, consumers, and the

competitive market, Defendant's conduct is "unfair" having offended an established public policy embodied in, among other things, 16 U.S.C. §1385, where Congress expressly found that it is the policy of the United States to protect the dolphin population and that "consumers would like to know if the tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins."  16 U.S.C. §§1385(b)(2)-(3).

113.   Defendant also engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to the public at large.

114.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

115.   **Fraudulent Business Practices:**  In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the dolphin safe representations and sustainable fishing methods representations, which are false, misleading, and/or deceptive to reasonable consumers, and by and failing to comply with traceability, and verification requirements, regarding the tuna products as set forth more fully herein.

116.   Defendant's actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq.*

117.   Plaintiffs relied on Defendant's dolphin safe representations and Defendant's compliance with traceability and verification requirements and were in fact injured as a result of those false, misleading, and deceptive representations and by Defendant's failure to comply with traceability, and verification requirements.

118.   As alleged herein, Plaintiffs have suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because they were exposed to and purchased Defendant's tuna products in reliance on the dolphin

Class Action Complaint

safe representations, sustainable fishing methods representations, and Defendant's compliance with tracing and verification requirements, but did not receive tuna products that contain tuna caught using fishing methods that do not harm dolphins.

119.   Unless restrained and enjoined, Defendant will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

120.   Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, seek declaratory relief and an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution of all money obtained from Plaintiffs and the members of the Classes collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

**COUNT II**
**Violations of the Consumers Legal Remedies Act – Cal. Civ. Code §§1750 *et seq.***
**(On Behalf of the California-Only Class)**

121.   Plaintiffs Duggan and Myers (the "California Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 106 above as if fully set forth herein.

122.   The California Plaintiffs bring this claim individually and on behalf of the California-Only Class.

123.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

124.   The California Plaintiffs is a consumer as defined by California Civil Code §1761(d). The tuna products are "goods" within the meaning of the CLRA.

125.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with the California Plaintiffs and the California-Only Class which were intended to

result in, and did result in, the sale of the tuna products:

>   (5)    Representing that [the tuna products have] . . . characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

>   *    *    *

>   (7)    Representing that [the tuna products] are of a particular standard, quality, or grade … if they are of another.

126.    Pursuant to California Civil Code §1782(d), the California Plaintiffs and the California-Only Class seek a Court Order declaring Defendant to be in violation of the CLRA, enjoining the above-described wrongful acts and practices of Defendant, and ordering restitution and disgorgement.

127.    Pursuant to §1782 of the CLRA, the California Plaintiffs notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

128.    If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the CLRA, the California Plaintiffs will amend this Complaint to add claims for actual, punitive, and statutory damages as appropriate.

129.    Pursuant to §1780 (d) of the CLRA, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

**COUNT III-**
**Violation of Florida Deceptive and Unfair Trade Practices Act – Fla. Stat.**
**§§501.201, *et seq.***
**(On Behalf of the Florida-Only Class)**

130.    Plaintiff Cosgrove repeats and incorporates by reference the allegations

1   contained in the paragraphs 1 through 106 above as if fully set forth herein.

2       131.   Plaintiff Cosgrove brings this claim individually and on behalf of the

3   Florida-Only Class.

4       132.   This cause of action is brought pursuant to the Florida Deceptive and

5   Unfair Trade Practices Act, §§501.201, *et seq.,* Fla. Stat. ("FDUTPA").  The stated

6   purpose of FDUTPA is to "protect the consuming public . . . from those who engage

7   in unfair methods of competition, or unconscionable, deceptive, or unfair acts or

8   practices in the conduct of any trade or commerce." §501.202(2), Fla. Stat.

9       133.   Plaintiff Cosgrove and the Florida-Only Class are consumers as defined

10  by §501.203, Fla. Stat.  The tuna products are goods within the meaning of FDUTPA.

11  Defendant is engaged in trade or commerce within the meaning of FDUTPA.

12      134.   Florida Statute §501.204(1) declares unlawful "[u]nfair methods of

13  competition, unconscionable acts or practices, and unfair or deceptive acts or

14  practices in the conduct of any trade or commerce." FDUTPA also prohibits false

15  and misleading advertising.

16      135.   Florida Statute §501.204(2) states that "due consideration and great

17  weight shall be given to the interpretations of the Federal Trade Commission and the

18  federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act."

19  Defendant's unfair and deceptive practices are likely to mislead – and have misled –

20  consumers acting reasonably in the circumstances, and violate §500.04, Fla. Stat.,

21  and 21 U.S.C. §343.

22      136.   Plaintiff Cosgrove and the Florida-Only Class have been substantially

23  injured and aggrieved by Defendant's unfair and deceptive practices and acts of false

24  advertising in that they paid for tuna products that were not dolphin safe and/or

25  sustainably caught as represented.  The harm suffered by Plaintiff Cosgrove and

26  Florida consumers was directly and proximately caused by the deceptive, misleading,

27  and unfair practices of Defendant, as more fully described herein.

28

137.    Pursuant to §§501.211(2) and 501.2105, Fla. Stat., Plaintiff Cosgrove and Florida consumers seek damages, injunctive relief, attorneys' fees and costs against Defendant.

## COUNT IV –
### Violations of the New York General Business Law § 349
### (On Behalf of the New York-Only Class)

190.    Plaintiffs Borruso and Nugent, Anthony and Lori Luciano, Robert and Colleen McQuade, and Fidel and Jocelyn Jamelo (the "New York Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 106 above as if fully set forth herein.

191.    The New York Plaintiffs bring this claim individually and on behalf of the New York-Only Class.

192.    Defendant's actions alleged herein constitute unlawful, unfair, and deceptive business practices.  Those actions include misrepresenting that the tuna products are "Dolphin Safe" when they are not.

193.    Defendant's conduct constitutes acts, uses and/or employment by Defendant or its agents or employees of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of §349 of New York's General Business Law.

194.    Defendant's deceptive conduct was generally directed at the consuming public.

195.    Defendant's unfair and deceptive trade acts and practices in violation of §349 of New York's General Business Law have directly, foreseeably, and

proximately caused damages and injury to the New York Plaintiffs and other members of the New York-Only Class.

196.   Defendant's deceptive conduct has caused harm to New York-Only Class members in that they purchased the tuna products when they otherwise would not have absent Defendant's deceptive conduct.

197.   Defendant's violations of §349 of New York's General Business Law threaten additional injury to the New York-Only Class members if the violations continue.

197.   The New York Plaintiffs, on their own behalf and on behalf of the New York-Only Class, seek damages, injunctive relief, including an order enjoining Defendant's §349 violations alleged herein, and court costs and attorneys' fees, pursuant to NY Gen. Bus. Law §349.

## COUNT V –
### Violation of the New Jersey Consumer Fraud Act, § 56:8-2.10
### (On Behalf of the New Jersey-Only Class)

198.   Plaintiffs Lantos and Zelig and Amar and Heena Mody (the "New Jersey Plaintiffs") repeat and incorporate by reference the allegations contained in paragraphs 1 through 106 above as if fully set forth herein.

199.   Defendant's tuna product packaging constitutes an "advertisement" within the meaning of §56-8-1(a) of the New Jersey Fraud Act, as it is an attempt by publication, dissemination, solicitation, indorsement, or circulation to induce consumers to acquire an interest in Defendant's merchandise.

200.   Defendant's tuna products constitute "merchandise" within the meaning of §56-8-1(c), as they are directly or indirectly offered to the public for sale and fall within one of the statutory categories of objects, wares, goods, commodities, services, or "anything."

201.   Defendant's tuna products are misrepresented within the meaning of

§56:8-2.10, as the descriptions of said products are misleading, the descriptions omit information in ways that render the description false or misleading, and/or the descriptions represent the merchandise as having qualities they do not have.

202. Specifically, Defendant has violated, and continues to violate, the New Jersey Fraud Act by representing that its tuna products are "Dolphin Safe" when they are not.

203. The New Jersey Plaintiffs, on their own behalf, and on behalf of the New Jersey-Only Class members, seek damages, injunctive relief, including an order enjoining Defendant's violations of the New Jersey Consumer Fraud Act alleged herein, and court costs and attorneys' fees.

**COUNT VI –**
**Violation of the Maryland Consumer Protection Act – Maryland Code §§ 13-101,** *et seq.*
**(On Behalf of the Maryland-Only Class)**

204. Plaintiff Depeza repeats and re-alleges the allegations contained in paragraphs 1-106 above, as if fully set forth herein.

205. Plaintiff Depeza brings this claim individually and on behalf of the Maryland-Only Class.

206. This cause of action is brought pursuant to the Maryland Consumer Protection Act, Maryland Code §§13-101, *et seq.* (the "MCPA"). The stated purpose of the MCPA is to "take strong protective and preventive steps … to assist the public in obtaining relief from [unlawful consumer practices], and to prevent these practices from occurring in Maryland." §13-102 (b)(3).

207. The MCPA prohibits unfair or deceptive trade practices in the sale or offer for sale of any consumer goods. §§13-303(1)-(2).

208. Plaintiff Depeza is a "consumer" and the tuna products are "consumer goods" as defined by §13-101 of the MCPA.

209. Defendant has engaged in and continues to engage in unfair or deceptive trade practices in connection with its sale of the tuna products because its dolphin safe representations and sustainable fishing method representations are false and/or misleading and have the capacity, tendency, or effect of deceiving or misleading consumers, as more fully described herein. §13-301(1).

210. Defendant has also engaged in and continues to engage in unfair or deceptive trade practices in connection with its sale of the tuna products by engaging in the following practices proscribed by §13-301(2):

> (i) representing that the tuna products "have … characteristic[s]… which they do not have"; and
>
> ***
>
> (iv) representing that the tuna products "are of a particular standard, quality, [or] grade … which they are not".

211. Plaintiff Depeza and Maryland consumers suffered injury or loss as a result of Defendant's conduct in that they paid for tuna products that were not dolphin safe and/or sustainably caught as represented, as more fully described herein.

212. Pursuant to §13-408, Plaintiff Depeza seeks damages and attorneys' fees.

## COUNT VII
### Violation of the Arizona Consumer Fraud Act,
### A.R.S. §§44-1521, *et seq.*
### (On Behalf of the Arizona-Only Class

213. Plaintiff Miller repeats and incorporates by reference the allegations contained in the paragraphs 1 through 106 above as if fully set forth herein.

214. This cause of action is brought pursuant to the Arizona Consumer Fraud Act, A.R.S. §§44-1521, et seq. ("ACFA"), which provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise,

misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A).

215.   Plaintiff Miller and members of the Arizona-Only Class are "persons" as defined by A.R.S. §44-1521(6), and Defendant is engaged in the "sale" and "advertisement" of "merchandise" as those terms are defined in A.R.S. §§44-1521(1), (5), and (7).

216.   Defendant engaged in deceptive and/or unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

(a) Misrepresenting material facts to Plaintiff Miller and the Arizona-Only Class in connection with the sale of its tuna products, by representing that the tuna products were dolphin safe and/or sustainably caught;

(b) Failing to disclose to consumers, including Plaintiff Miller and the Arizona-Only Class, that the tuna products were not dolphin safe nor sustainably caught contrary to Defendant's representations;

(c) Failing to reveal a material fact – that Defendant's tuna products were neither dolphin safe nor sustainably caught as represented – the omission of which tends to mislead or deceive consumers, and which fact could not reasonably be known by consumers; and

(d) Making a representation of fact or statement of fact material to the transaction – i.e., that Defendant's tuna products were dolphin safe and/or sustainably caught – such that a person reasonably believed they were when they were not.

217.   Plaintiff Miller relied on Defendant's representations and had

Defendant disclosed that its tuna products were not dolphin safe and/or sustainably caught as represented, Plaintiff Miller would have paid less or, more likely, not purchased the tuna products at all. Thus, as a result of Defendant's representations and omissions, Plaintiff Miller and Arizona-Only Class Members were induced to overpay for and purchase tuna products they otherwise would not have.

218.   Defendant intended that Plaintiff Miller and the Arizona-Only Class rely on its deceptive and/or unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's sale of the tuna products.

219.   Defendant's wrongful practices occurred in the course of trade or commerce.

220.   Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct that applied to Plaintiff Miller and all Arizona-Only Class Members, and were repeated continuously before and after Defendant sold its tuna products to Plaintiff Miller and the Arizona-Only Class.  All Arizona-Only Class Members have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

221.   Defendant's unfair and/or deceptive conduct proximately caused Plaintiff Miller's and Arizona-Only Class Members' injuries because, had Defendant sourced its tuna from vessels using dolphin safe and sustainable fishing methods, Plaintiff Miller and the Arizona-Only Class Members would not have suffered injury.

222.   Plaintiff Miller and the Arizona-Only Class seek actual damages, compensatory, punitive damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the ACFA.

\\

\\

\\

**Count VIII –**
**Unjust Enrichment/Quasi-Contract**

223.   Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

224.   Plaintiffs and Class members conferred a benefit on Defendant by purchasing the tuna products.

225.    Defendant appreciated and/or realized the benefits in the amount of the purchase price it earned from sales of the tuna products to Plaintiff and Class members or, at a minimum, the difference between the price it was able to charge Plaintiffs and Class members for the tuna products with the dolphin safe representations and sustainable fishing method representations and the price they would have been able to charge absent the same.

226.   Defendant has profited from its unlawful, unfair, false, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

227.   Plaintiffs do not have an adequate remedy at law against Defendant.

228.   Plaintiffs and Class members are entitled to restitution of all monies paid for the tuna products or, at a minimum, the premium paid for the tuna products.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for a judgment:

A.    Certifying the Classes as requested herein;

B.    Issuing an order declaring that Defendant has engaged in unlawful, unfair, and deceptive acts and practices in violation of the consumer fraud laws in the certified states;

C.    Enjoining Defendant's conduct and ordering Defendant to engage in a corrective advertising campaign;

Class Action Complaint

D.    Awarding the Classes damages, including statutory and punitive damages, and interest thereon;

E.    Awarding disgorgement and restitution of Defendant's ill-gotten revenues to Plaintiffs and the Classes;

F.    Awarding attorneys' fees and costs; and

G.    Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated:  May 13, 2019          BONNETT, FAIRBOURN, FRIEDMAN
                                                    & BALINT, P.C.

                                                     /s/*Patricia N. Syverson*
                                                    Patricia N. Syverson (203111)
                                                    Manfred P. Muecke (222893)
                                                    600 W. Broadway, Suite 900
                                                    San Diego, California 92101
                                                    psyverson@bffb.com
                                                    mmuecke@bffb.com
                                                    Telephone:  (619) 798-4593

                                                    BONNETT, FAIRBOURN, FRIEDMAN &
                                                    BALINT, P.C.
                                                    Elaine A. Ryan (*To Be Admitted Pro Hac Vice*)
                                                    Carrie A. Laliberte (*To Be Admitted Pro Hac Vice*)
                                                    2325 E. Camelback Rd., Suite 300
                                                    Phoenix, AZ 85016
                                                    eryan@bffb.com
                                                    claliberte@bffb.com
                                                    Telephone:  (602) 274-1100

                                                    GOLDMAN SCARLATO & PENNY P.C.
                                                    Brian D. Penny (*To Be Admitted Pro Hac Vice*)
                                                    penny@lawgsp.com
                                                    8 Tower Bridge, Suite 1025
                                                    161 Washington Street
                                                    Conshohocken, Pennsylvania 19428
                                                    Telephone:  (484) 342-0700

                                                    ZAREMBA BROWN PLLC
                                                    Brian M. Brown (*To Be Admitted Pro Hac Vice*)
                                                    bbrown@zarembabrown.com

- 57 -
Class Action Complaint

40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (*To Be Admitted Pro Hac Vice*)
Christopher C. Gold (*To Be Admitted Pro Hac Vice*)
Bradley M. Beall (*To Be Admitted Pro Hac Vice*)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

Attorneys for Plaintiffs